UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
UNITED STATES OF AMERICA        :

          - v -                 :

ALEXANDER CHAN, et. al.,        :                 **20 Cr. 160 (MKV)**

               Defendant.       :
------------------------------X


### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ALEXANDER CHAN'S MOTION TO SUPPRESS WIRETAP INTERCEPTIONS AND GRANT AN EVIDENTIARY HEARING


                              **DAVID E. PATTON, ESQ.**
                              Federal Defenders of New York
                              Attorney for Defendant
                               **ALEXANDER CHAN**
                              52 Duane Street - 10th Floor
                              New York, New York 10007
                              Tel.: (212) 417-8760

**ROBERT M. BAUM, ESQ.**
     Of Counsel



TO:  **AUDREY STRAUSS, ESQ.**
     Acting United States Attorney
     Southern District of New York
     One St. Andrew's Plaza
     New York, New York 10007
     Attn:  **ANDREW ADAMS, ESQ.**
            **SARAH MORTAZAVI. ESQ.**
            **BENET KEARNEY,ESQ.**
            Assistant United States Attorneys

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
UNITED STATES OF AMERICA     :

    - v. -           :       **20 Cr. 160 (MKV)**

**ALEXANDER CHAN, et. al.,**     :

         Defendant.   :
------------------------------X

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ALEXANDER CHAN'S MOTION TO SUPPRESS WIRETAP INTERCEPTIONS AND CONDUCT AN EVIDENTIARY HEARING

### PRELIMINARY STATEMENT

Alexander Chan, by undersigned counsel, respectfully submits this Memorandum of Law pursuant to 18 U.S.C. § 2518(10) and Franks v. Delaware, 438 U.S. 154 (1978) in support of his Motion to Suppress Wiretap Interceptions on the grounds that the evidence was obtained in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), and 18 U.S.C. §§ 2510-2522.

Specifically we seek to suppress evidence obtained as a result of wiretap authorizations for phones used by Jason Servis, based on an Affidavit dated April 30, 2019 and subsequent Order extending the wiretap; as well as Kristian Rhein, based on an Affidavit dated June 27, 2019, and subsequent Order for extension.

Conversations with Alexander Chan were unlawfully obtained

2

as a result of these wiretaps and Mr. Chan is an aggrieved party with standing to bring this motion pursuant to 18 U.S.C. §2510 (11). Pursuant to 18 U.S.C. §2515, if the interception of a communication violates Title III, "no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court... ."

Accordingly, Alexander Chan joins in the motion to suppress wiretap evidence submitted by defendant Jason Servis as well as any exhibits and factual statements made in support of that motion.

When the FBI filed wiretap affidavits to intercept calls from Jason Servis and Kristian Rhein, they knowingly and intentionally misrepresented to the court that SGF-1000 and Clenbuterol were performance enhancing drugs ("PEDs"). They did so despite knowledge that SGF-1000 had been tested by a world renown laboratory, the Hong Hong Jockey Club Lab, which the FBI itself relied upon for testing, and had been found not to be a PED nor to contain growth factors. Those tests were conducted on at least two separate occasions by the Hong Kong Jockey Club lab and one other lab at U.C. Davis Maddy laboratory (at the request of the Racing Medication and Testing Consortium in 2014). Each test confirmed the same result. They intentionally omitted from their affidavits any test results finding that SGF-1000 was not a

PED. They claimed without any scientific basis, that Clenbuterol was a PED, despite its wide acceptance in the Racing industry as a therapeutic drug which is commonly used. They omitted from advising the Court in their affidavits that blood tests conducted for post race testing during this multi year investigation, did not demonstrate that Jason Servis had ever used a PED for any of his horses.

The affidavits filed in support of the wiretap applications for Servis and Rhein violated the statutory obligation of candor and truthfulness to the court, and as a result, the intercepted phone calls were in violation of the requirements established by Title III.  The wiretap authorizations were obtained based on sworn affidavits of FBI Agents that was rife with "deliberately or recklessly false statement[s]" and material omissions of statutorily and constitutionally required information. Id. at 165. *Franks* instructs a District Court to hold a hearing to determine whether the alleged misstatements or omissions in the wiretap affidavits were made intentionally or with reckless disregard or the truth and if so, whether such misstatements and omissions were material.

Title III obligated the affidavits to contain "full and complete" statements of fact establishing both (1) probable cause to believe that the targeted cell phones were being used in furtherance of one or more of the predicate offenses specifically

4

enumerated in 18 U.S.C. § 2516; and (2) the necessity of resorting to a wiretap because less intrusive investigative techniques had failed or would be futile if tried. We challenge the wiretap Orders based on the failure of the affidavits submitted for Servis and Rhein, to meet these requirements.  As with all such *ex parte* applications, the Court's ability to provide the independent and impartial review that the Fourth Amendment and Title III require was dependent on the government's full, complete, forthright and truthful disclosure in their supporting affidavits.

However, the Affidavits submitted did exactly the opposite, forsaking the obligation of candor and forthcoming disclosure in favor of intentionally false and misleading statements, strategically selective disclosures, material misstatements of evidence, and the withholding of critical and statutorily required information essential to the court's review of the application. As a result, the courts were misled into finding that the Title III requirements were satisfied and issued the requested wiretap authorization for both Servis and Rhein.

The wiretap authorizations based on the affidavits submitted with intentionally false and misleading statements, results in a lack of probable cause for the issuance of such warrants when these material statements are eliminated because they are at the very heart of the probable cause allegations. Material omissions, made with a reckless disregard for the truth, would also have demonstrated that probable cause did not exist. The affidavits also failed to demonstrate the requisite necessity for the issuance of wiretap authorizations.

In addition, suppression is warranted because the wiretaps were

directed at an offense, misbranding, which is not an offense for which
Congress has authorized the use of wiretaps as part of Title III's
carefully limited grant of authority for "employment of this
extraordinary investigative device." *United States v. Giordano*, 416
U.S. 505, 527 (1974). Although the Government, in its submitted
affidavits cited other authorized offenses, and recognized that
misbranding was not an authorized offense, the affidavits asserted
facts solely addressing the offense of misbranding, with broad
conclusory assertions as to other designated offenses, unsupported by
facts. It was not until subsequent affidavits were submitted with
factual assertions related to authorized crimes, that Title III's
requirements were met. However, the evidence derived for those
subsequent affidavits came from the initial illegal wiretaps and thus
must result in suppression.

Moreover, the affidavits were misleading and incomplete in its
requirement to explain to the Court that "normal investigative
procedures have been tried and have failed or reasonably appear to be
unlikely to succeed if tried or to be too dangerous." 18 U.S.C.
§2518(3)(c).

Genuinely independent judicial review of wiretap applications
cannot function, nor can Congress' "overriding congressional concern"
for the privacy of the countless individuals whose conversations are
recorded, *Gelbard v. United States*, 408 U.S. 41, 48 (1972), be
protected, when the government's duty of full and forthright
disclosure to the authorizing court is so broadly disregarded. For a
wiretap to pass constitutional muster, a fully informed court must

independently determine that "special facts" demonstrating "exigency," *Berger v. New York, 388 U.S. 41 (1967),* create a "genuine need" for government officials to secretly intercept private conversations, *Dalia v. United States,* 441 U.S. 238, 250 (1979). That procedure of impartial and fully informed "antecedent justification" is "a constitutional precondition of ... electronic surveillance." *Katz v. United States,* 389 U.S. 347, 359 (1967) (citation omitted).

## STATEMENT OF FACTS

Alexander Chan is charged with one count of engaging in a conspiracy to procure and distribute adulterated and misbranded performance enhancing drugs ("PEDs") to racehorses, and a second count of engaging in a mail fraud and wire fraud conspiracy. Indictment S6 20 Cr. 160 (MKV).

Dr. Chan has been a veterinarian since 2006, following his graduation from The University of Pennsylvania, School of Veterinary Medicine. His most recent employment has been with the Empire Veterinary Group, from 2016 to 2020, where he was employed as an associate veterinarian, working for Kristian Rhein. His employment at Empire Veterinary Group involved work which occurred solely within New York State, specifically in the New York City area. He has a steady history of employment as a veterinarian since his graduation including employment with the New York Racing Association from 2012 to 2015 as a track veterinarian and regulatory veterinarian in charge of conductng

7

pre-race musculo-skeletal examinations and ID verifications of thoroughbreds.

The FBI has been investigating the use of performance enhancing drugs in the racing industry since 2017. *See* Baum Affirmation*,* Exhibit A*,* Servis Affidavit by S.A. Bentsson, at 17; Exhibit B, Rhein Affidavit by S.A. Bergen at 21. As early as 2013, The Jockey Club, which holds itself out to be an organization dedicated to the improvement of thoroughbred breeding and racing, has been looking into the use of PEDs, specifically focusing on SGF-1000. In 2014, they requested that the Racing Medication and Testing Consortium (RMTC), purchase and test a sample of SGF-1000, which is one of the alleged PEDs at the center of the wiretap application filed through affidavits of FBI agents for wire interceptions of both Jason Servis and Kristian Rhein. RMTC Memo, Baum Affirmation Exhibit C. The testing conducted in 2014 demonstrated that SGF-1000 had no illegal growth factors and was not a PED. After testing by the UC Davis Maddy lab, which was sent a sample of SGF-1000, the RMTC recommended to the Jockey Club that "given the limited efficacy of the product ...  It might be better to pursue this as an unlicensed medication." Baum Affirmation, Exhibit C, RMTC Memo.

Since the testing was done at the request of the Jockey Club, and the results sent to them, subsequent FBI meetings with the Executive Vice President and Executive Director of the Jockey

8

Club in August, 2018, as part of the FBI's investigation into the use of PEDs as well as SGF-1000, should have revealed these results. Baum Affirmation, Exhibit D. In addition, printed news reports disclosed that Australian Racing officials tested SGF-1000 in 2015, and discovered that it did not contain any prohibited substances. At the time of that discovery, it had been widely reported as Australian Racing Stewards had warned all trainers not to use this substance. Baum Affirmation, Exhibit E, The Sydney Morning Herald, March 11, 2020. The FBI investigation had to discover this.

As part of their investigation which commenced in 2017, the FBI has been working with

*See*

Servis Affidavit by S.A. Bentsson at 18-19. There are documented meetings with          and Special Agent            as early as January 25, 2018 when          informed the FBI that he controlled which horses could be subject to out of competition blood tests. He also advised the FBI that the Hong Kong lab was one of the best in the world with the ability to test for drugs and banned substances that other labs could not. He had been communicating with Dr. Wan at the lab. Baum Affirmation, Exhibit F. The FBI subsequently began communicating directly with the Hong Kong lab and Dr. Wan. Exhibit M.

The significance of these communications prior to the Servis

and Rhein affidavits, is that the FBI should have known and probably did know, what was known to            and Dr. Wan at the Hong Kong Jockey Club Lab, that is, that years earlier, Hong Kong had analyzed SGF-1000 and determined that it contained no growth factors and was not a PED. Baum Affirmation, Exhibit G.

Moreover, months before the Servis Affidavit, in January, 2019, the FBI requested that a Confidential Source purchase several substances believed to be PEDs for lab testing. Although SGF-1000 was readily available for purchase to be tested, they neglected to make such a purchase, likely because they already knew the result. *See* Baum Affirmation Exhibit N.

It is unlikely and improbable that these FBI agents did not know that SGF-1000 had been tested prior to affidavits they submitted in which it had been found not to contain any illegal growth factors. They intentionally ignored the results of their investigation which had focused on SGF-1000 and its history of testing and intentionally omitted these facts from their affidavits.

As early as August 28, 2018, S.A            was also collaborating with a private agency conducting a parallel investigation called 5 Stones Intelligence, who was hired by the Jockey Club, even conducting witness interviews while a 5 Stones investigator was present. Baum Affirmation Exhibit D. This collaboration should also have revealed what 5 Stones knew, that

SGF-1000 is not a PED. That is because 5 Stones, conducting their investigation on behalf of the Jockey Club, purchased SGF-1000 and submitted it to the Hong Kong Lab for testing. The result was that it tested negative for growth factors and was not a PED.

S.A.          collaborated with investigators from the New Jersey Racing Commission on more than one occasion, allowing him to obtain out of competition blood samples for Jason Servis' horses to determine the presence of PEDs or other illegal substances. Baum Affirmation Exhibits H, M. Servis horses were tested on June 1, June 3, June 5, and July 11, 2019. *Id.*

Notably omitted from the Servis and Rhein affidavits is the fact that in addition to out of competition testing conducted at the request of the FBI with negative results, the FBI never disclosed to the Court that post race testing of Jason Servis horses during the period of time that Jason Servis was under investigation by the FBI, has never resulted in a positive finding for illegal substances or PEDs. This fact negates the request for wiretaps based on necessity, demonstrates the lack of probable cause for a warrant and illustrates the blatant omissions, along with false statements and misrepresentations, which should result in suppression of the wiretaps and warranting a *Franks* hearing.

On April 30, 2019 when S.A.                submitted an affidavit (for Jason Servis), falsely claiming that SGF-1000 was

an illegal PED and contained illegal growth factors, he had been in contact with the Hong Kong Jockey Club Lab since January, 2019, and had to know that recent testing had already commenced by that lab on SGF-1000. Refusing to wait for the test results, and ignoring earlier tests conducted by the same Hong Kong lab, he falsely claimed that SGF-1000 was a PED in his affidavit despite the body of evidence that it was not, intentionally misleading the Court into a finding that probable cause existed for the granting of their wiretap application.

Moreover, the FBI was actually aware of the results of the Hong Kong Lab's testing of SGF-1000 by an email sent by

to S.A.        on June 24, 2019, and forwarded to other agents on that same date, which found that SGF-1000 had "no detectable amount of growth factors." The Hong Kong Jockey Club lab noted that it had tested SGF-1000 several years ago, a fact that the FBI had to know based on their continued relationship with the lab for months prior to the Servis affidavit. Certainly, based on this email and other investigative steps, when S.A.

filed his affidavit for wiretaps regarding Kristian Rhein on June 27, 2019, he falsely claimed several times, that SGF-1000 had been found to be a PED containing illegal growth factors. Nor did the FBI disclose in the wiretap affidavits for Jason Servis and Kristian Rhein, that post race blood tests for Jason Servis' horses in 2018 and 2019 never disclosed the presence of a PED.

Where an FBI agent makes several direct claims in a sworn affidavit that the target of wiretaps has been using a known PED (SGF-1000), to affect the performance of horses, it is difficult to contemplate that this fact alone wouldn't warrant the issuance of a wiretap order on the basis of probable cause. If this fact were intentionally and deliberately false, it is impossible to contemplate that this statement was not material and improperly resulted in the authorization to conduct wiretaps.

## ARGUMENT

If the statutory and constitutional commands that the government provide the court with a "full and complete" statement of the facts establishing probable cause and the necessity of resorting to wiretapping are to mean anything, they must mean that the misrepresentations, false statements and omissions of material facts that pervaded the government's wiretap applications in this case mandate suppression or, at a minimum, a hearing under *Franks v. Delaware,* 438 U.S. 154 (1978), to assess the extent of intentional or reckless misstatements and the appropriateness of suppression. That is because the information that the government deliberately and recklessly kept from the authorizing court in this case goes to the very heart of the probable cause and necessity determinations and constitutes the type of critical information about the factual basis for probable

13

cause, and the investigative needs of law enforcement that any
reasonable judge would want to know. The system of *ex parte*
applications for wiretap authorizations simply cannot function -
because courts cannot provide genuinely independent review of the
statutory and constitutional prerequisites to wiretapping -
unless a foundational level of governmental candor and
forthrightness is maintained. In this case, that duty was
breached, which warrants suppression.

I.    **The Servis and Rhein Affidavits Contained Material
      Omissions And Intentionally False and Misleading
      Statements Which Do Not Support A Finding of Probable
      Cause**

When the Fourth Amendment and Title III "demand[] a factual
showing," the "obvious assumption is that there will be a
*truthful* showing" by the government. *Franks,* 438 U.S. at 164-165
(quotation omitted) (emphasis in original). The use of
intentionally or recklessly false statements in wiretap
affidavits is "an unthinkable imposition" on the ability of the
court to "determine independently whether there is probable
cause." *Id.* at 165.

To enforce Title III's stringent requirements,
Congress enacted a distinct statutory rule of suppression
that supplements the "judicially fashioned exclusionary
rule aimed at deterring violations of Fourth Amendment

14

rights." *Giordano,* 416 U.S. at 524. Title III's statutory suppression rule mandates the exclusion in court proceedings of "the contents of any [wiretap], or evidence derived therefrom" if the wiretap evidence "was unlawfully intercepted," 18 U.S.C. § 2518(10)(a)(i), *i.e.,* "where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *Giordano,* 416 U.S. at 527. Because the "full and complete statement" provisions "play a central role in the statutory scheme," suppression "must follow when," as here, those provisions "ha[ve] been ignored" by the government. *Id.* at 528. In addition, the Fourth Amendment independently requires a hearing to examine evidence of "deliberate falsehood or of reckless disregard for the truth" in the government's wiretap application, and suppression when, as here, "the remaining content" of the affidavit "is insufficient" to establish probable cause. *Franks,* 438 U.S. at 171-72; *see United States v. Ferguson,* 758 F.2d 843, 848-49 (2d Cir. 1985) (applying *Franks* to wiretap affidavit).

The affidavits for both Servis and Rhein contain

numerous false statements and misrepresentations made concerning two drugs which have never been proven to act as PEDs or contain growth factors; SGF-1000 and Clenbuterol. Each of the affidavits allege that SGF-1000 "is a performance enhancing substance known as a growth factor that promotes tissue repair."  The Rhein affidavit makes this demonstrably false statement at least three times.        Affidavit at 66, 68, 76.

At the time that S.A.          wrote this statement in the affidavit for a wiretap of Kristian Rhein, he had received an email communication, three days earlier, forwarded to him from S.A.             . confirming that tests conducted by the Hong Kong Jockey Club lab determined that SGF-1000 contains no growth factors and is not a PED. Baum Affirmation, Exhibit I, FBI Email sent to S.A. dated June 24, 2019.

At the time that S.A          wrote this statement in an affidavit to support a wiretap of Jason Servis, he had been working with the Hong Kong Jockey Club lab for over three months, testing blood samples sent to them from the FBI looking for PEDs, including SGF-1000. He should have known and likely did know that this same lab had tested SGF-1000, received from Medivet Equine years earlier, finding no growth factors, no PEDs. The FBI had the ability to purchase and

test SGF-1000 but did not do so. This is stunning in view of
the fact that in January, 2019, they directed a confidential
source to purchase other substances for testing which they
believed to be PEDs. Baum Affirmation Exhibit N.

In addition, a notable omission from the Servis
Affidavit were the results of the out of competition blood
tests, conducted during the course of the FBI's
investigation. Also omitted was the fact that no Jason Servis
horses had ever tested positive for PEDs in any post race
blood tests during their investigation. The Servis affidavit
makes reference to the success that Servis horses had in
2018, intimating that this was due to PEDs. However, it does
not indicate that of the 143 wins by Servis horses in 2018,
not a single post race blood test demonstrated the presence
of an illegal substance.

S.A.          affidavit for the Servis wiretap alleges
incorrectly that Clenbuterol "assists a horse's breathing,
which enhances the horse's performance." Affidavit at 55.
This misleading and false statement is incorrect since the
Government's own expert in this case, (Dr. Cynthia Cole) has
testified that any such effect lasts only a few hours after
administration. It would have had to be administered to a
horse shortly before a race and would have been found in post
race blood tests.  The Servis affidavit points to the fact

that three of Servis' horses placed first in races at
Gulfstream Park on February 14, 2019, noting that under
Florida Rules "trainers are prohibited from administering
performance-enhancing substances to a horse to affect the
outcome of a race." *Id*. at 55, FN 26. They did not tell the
court in their affidavit that all three horses were tested
and none of them had Clenbuterol in their system.

Another omission in the Rhein and Servis Affidavits were
the results of blood tests for samples taken under the
authority of                                for the
Meadowlands Racetrack, who had been meeting and working
closely with the FBI. Between January, 2018 and May, 2019,
            sent samples for testing to the Hong Kong Jockey
Club lab. The results of these samples, representing a
significant number of blood tests, including horses trained
by Jason Servis, were not disclosed in the Affidavits by
agents. Baum Affirmation Exhibit H.

The Servis affidavit also alleges that Clenbuterol has
been used illegally to enhance a horse's performance.
Bentsson Affidavit at 55. Clenbuterol is a therapeutic drug
that is used regularly to treat asthma in horses. It is not
an illegal substance under any of the racing rules cited in
the           affidavit and has never been scientifically
found to be a performance enhancing drug. The Servis

18

affidavit cites numerous state "Rules" related to Clenbuterol
but no allegation that any of those rules were violated such
as to provide probable cause for a wiretap order. For
example, Agent Bentsson writes that the NY Gaming Commission
bans drugs with no accepted medical use in the horse when
treated. This would not cover Clenbuterol nor is it alleged
that this rule was violated. A July 31, 2018 publicly
available "Equine Medical Advisory" released by the New York
State Gaming Commission regarding Clenbuterol, sets forth
that its use is not prohibited when used in compliance with
existing NYSGC rules, 9 NYCRR 4043.2(i)(3) and 4043(5). In
other words Clenbuterol was permitted in New York at that
time so long as it is present in the horse's system below a
threshold limit and not administered within 14 days of a
race. Similar rules exist in New Jersey and Florida.  Florida
Rules prohibit substances administered within 24 hours of a
race within a level that exceeds normal physiological
concentrations. There is no such allegation in the affidavit
although the affidavit's misrepresentations attempt to have
the Court infer that the use of Clenbuterol is illegal.

As set forth in his Affidavit, the presence of
Clenbuterol in trace amounts does not violate racing rules.
There is no evidence that Clenbuterol has been found in any
of Jason Servis' horses in anything but trace amounts if at

19

all. The affidavit however, misrepresents that Clenbuterol is a performance enhancing substance. While certain state "Rules" prohibit the use of Clenbuterol within 14 days of a race, the presence of a trace amount in any horse does not indicate a violation of these rules and regardless, does not represent a substance that is performance enhancing such as to affect the performance of a horse.

The Rhein affidavit also alleges that tranquilizers can be used as a performance enhancing substance by calming a horse, improving focus, and thus performance. Bergen Affidavit at 95.  This misleading statement is the equivalent of saying that aspirins taken by athletes are performance enhancing because they cure headaches and allow the athlete to focus on performance. In fact, the tranquilizer Acepromazine, referred to as found in one lab test, is a commonly used tranquilizer for horses. It stabilizes mood, reduces anxiety and controls aggressiveness. In addition, it lasts for only 30-60 minutes. There is no allegation that the tranquilizer was used on the day of races for any of Servis' horses. It is commonly used.

## II.  Suppression Under *Franks*

Where a defendant makes a "substantial preliminary showing" that a wiretap affidavit contains false statements or omissions made "knowingly and intentionally, or with

reckless disregard for the truth," and such misstatements and omissions were "necessary to the finding of probable cause," "the Fourth Amendment requires that a hearing be held" to determine whether suppression is warranted. *Franks,* 438 U.S. at 171-72.   "Recklessness may be inferred where the omitted information was 'clearly critical' to the probable cause determination." *Rivera v. United States,* 928 F.2d 592, 604 (2d Cir. 1991) (citation omitted). As specifically detailed herein and supported by the attached exhibits, Dr. Chan has made the requisite "substantial preliminary showing" and is entitled to a *Franks* hearing because, absent the recklessly or intentionally false statements and material omissions contained in the Servis and Rhein affidavits, probable cause to believe that the designated offenses under Title III were committed, cannot be established. *See Franks,* 438 U.S. at 171-72; *Canfield,* 212 F.3d 714, 718; *United States v. Bianco,* 998 F.2d 1112, 1125 (2d Cir. 1993).

### III.      The Affidavits Do Not Address Title III Designated Offenses

Misrepresentations in the affidavits are compounded by the government's request to use wiretaps to investigate a crime - misbranding- that Congress specifically determined

21

did not warrant the use of wiretaps and for which Congress accordingly withheld wiretap authority. The Servis and Rhein affidavits made reference to other designated Title III offenses, but offered no facts to support those allegations. Factual statements about the use of drugs that may be mislabeled or used without a prescription make out a probable cause case for misbranding, a non designated offense. For example, if Clenbuterol was used without a valid prescription, that is misbranding, not fraud.

Allegations of fraud involving electronic transfers of purse money or wire registration of horses are misleading. While each of Servis' and Rhein's affidavits reference that the use of wires is used to register horses in races and to distribute purse winnings, there is no allegation that either Servis or Rhein engaged in wire transfers. The affidavits indicate that registration of horses may be done by wire **or in person.** The winnings in races may be transferred electronically, **or by hand.**          Affidavit for Servis, at 29; Bergen affidavit for Rhein at 70.

Allegations that the use of performance enhancing drugs may result in fraud on the betting public, the racetracks, or competitors is misleading. Moreover, there is no factual basis to believe that SGF-1000 or

Clenbuterol are PEDs, thus no basis for a probable cause
finding related to fraud. In addition, the fact that there
is no evidence nor factual assertions in any affidavit
that Jason Servis or Kristian Rhein placed any bets on the
horses they allegedly doped, further negates any finding
of fraud as a matter of law. *United States v. Webb*, 24
F.Supp.3d 432 (M.D. Penn. 2014), distinguishing *United
States v. Martin*, 411 F.Supp. 2d 370 (S.D.N.Y. 2006).

Allegations in the Rhein affidavit based on wiretap
conversations obtained as a result of the order issued to
wiretap Jason Servis, may not be used to establish
probable cause if that order was obtained in violation of
Title III's strict requirements. Consequently, those
allegations cannot provide probable cause for the Rhein
wiretap. (e.g. allegations of false billing captured in
the Servis wiretaps). 18 U.S.C. §2515.

## IV.   The Wiretap Affidavits Do Not Satisfy the
## Necessity Provision of Title III

Title III's requirement that the government provide
the authorizing court with a "full and complete statement
of the facts and circumstances" establishing probable
cause and a "full and complete statement" of the other
"investigative procedures [that] have been tried" and the

reasons that other measures would "be unlikely to succeed," 18 U.S.C. § 2518(1)(b),(c), are the backbone of the statute's requirement that "[t]he district judge, not the agents, must determine whether the command of Congress has been obeyed." *United States v. Spagnuolo*, 549 F.2d 705, 711 (9th Cir. 1977). Unless the government sets forth the relevant facts and circumstances comprehensively and candidly, the court cannot make the "independent evaluation of the matter" that both Title III and the Fourth Amendment require. *Franks*, 438 U.S. at 165; *See United States v. Gigante*, 538 F.2d 502, 503 (2d Cir. 1976) (Title III was designed "to ensure careful judicial scrutiny"). "[T]he affidavit must show with specificity why in *this particular investigation* ordinary means of investigation will fail." *United States v. Robinson,* 698 F.2d 448, 453 (D.C. Cir.1983) (per curiam); *see United States v. Ippolito,* 774 F.2d 1482, 1486 (9th Cir. 1985) (same).

The Second Circuit has acknowledged that it would be more efficient to wiretap whenever a phone was used to facilitate the commission of a crime, but the statutory requirement reflects a congressional judgment that the cost of such efficiency in terms of the privacy interests is too high. *United States v. Concepcion*, 579 F.3d 214,

24

218 (2d Cir. 2009), *citing United States v. Lilla*, 699 F2d 99, 105 n.7 (2d Cir. 1983).

To justify the wiretap request, each of the affidavits allege that other investigative methods have been tried and would be unlikely to succeed. That is not true.

It is astonishing that even the most basic and apparent investigative technique was not utilized by the FBI. They never purchased or obtained a sample of SGF-1000, openly sold by Medivet Equine, for testing before they declared it to be a PED with growth factors.

For Jason Servis, it is alleged that he had been using SGF-1000 as a PED for his horses.  The affidavit claims as to necessity, that a wiretap was necessary to determine the source of his supply and the network of distribution and means for obtaining and administering substances. The FBI were aware that Servis' trainer, Kristian Rhein was associated with Medivet Equine which openly advertised the sale of SGF-1000. Rhein advertised that he was a scientific research consultant for Medivet from 2013 to 2020 and he also held an ownership interest. *See* Medivet Equine website, Baum Affirmation Exhibits J, K, L. Determination of the source of SGF-1000 is apparent. If the FBI subpoenaed Medivet records of sales, they would have determined exactly when, where, and how much SGF-1000

was sent to Jason Servis or his trainer Kristian Rhein. If they subpoenaed Medivet or Servis emails, they could have reached the same conclusions. If they subpoenaed Servis and Rhein bank records, they could have discovered the transfer of funds to Medivet and dates of transfers. Billing records would also provide results unavailable in wiretaps. Delivery records would show exactly to whom and the location where the substances were stored upon delivery, providing information which could be used in search warrants. In fact, the          Affidavit for Jason Servis, acknowledged the value of search warrants which were issued and executed with delayed notification. Bentsson Affidavit at 71, FN's 35, 36.

The FBI also had the ability to request the testing of blood samples of Servis horses in out of competition tests, which they specifically requested on at least one prior occasion in December, 2018, asking a New Jersey Racing Commission Investigator to take samples from seven horses. Baum Affirmation Exhibit L, FBI Report. Continuation of this practice, which began months prior to the wiretap application would have provided valuable information as to the specific horses that may have been subjected to illegal substances. Once horses were determined to have been provided illegal substances (if any), the FBI

could have determined their locations at the approximate time they would have been doped and then could have executed search warrants to recover any illegal substances. None of this was done, nor was the FBI's use and ability to obtain out of competition blood tests disclosed to the court in any affidavit.

Accordingly, because "the necessity requirement 'directly and substantially implement[s] the congressional intention to limit the use of intercept procedures to those situations clearly calling for their employment,"' *United States v. Mondragon,* 52 E3d 291, 294 (10th Cir. 1995) (quoting *United States v. Donovan,* 429 U.S. 413, 433-34 (1977)), and because the record in this case illustrates with unusual clarity that the "normal investigative procedures that *were* used were successful," *United States v. Lilla,* 699 F.2d 99, 104, (2d Cir. 1983) and methods not used would have achieved the desired results, the wiretaps and evidence` derived therefrom must be suppressed.

To show that traditional methods would not be likely to succeed, an affidavit must allege specific circumstances that render normal investigative techniques particularly ineffective. *Ippolito,* 774 F.2d at 1486. Boilerplate assertions that "are unsupported by specific facts relevant to the particular circumstances of [the] case" are not sufficient. *United States v. Blackmon,* 273 F.3d 1204, 1210

(9th Cir. 2001).

In fact, the                    affidavit for Servis acknowledged that financial investigation had provided valuable information and that on-going wiretaps had disclosed new information. Bentsson affidavit at 73-74.

The             Affidavit (Servis) and the             Affidavit (Rhein), as demonstrated above, contains omissions and misstatements regarding the necessity for a wiretap. Absent these material misstatements and omissions, each application contains only generalized statements rather than specific facts necessary to satisfy the requirements of §2518(1)(c).

**IV.    There Is No Probable Cause To Believe That Jason Servis' and Kristian Rhein's Cell Phones Which Are The Target Of The Wiretap Authorizations Were Being Used For Criminal Purposes**

Title III wiretap authorizations require that probable cause be established to believe that the targeted phone is being used for criminal purposes, or "are leased to, listed in the name of, or commonly used by such person." 18 U.S.C. §2518(3)(d).

The             affidavit for Jason Servis notes that the target cellphone is not "leased to" Jason Servis, but is subscribed to in the name of "Natalie Servis." Affidavit at 8. Nor does the affidavit satisfy the requirement that the target phone is "commonly used by" Jason Servis. S.A.

Bentsson notes that on one occasion, the intercepted phone call of the Navarro phone, disclosed that the user was referred to as "Jason." Subsequent conversations of an innocuous nature are alleged by Bentsson to be between Navarro and Jason Servis. In addition, the target phone is listed as a contact number for Jason Servis' business, neither of which establishes the "commonly used" criteria required. Bentsson affidavit at 8, FN 10.

The government bears the burden of showing, through a "full and complete statement" of the relevant facts and circumstances, "a fair probability that . . . evidence of a crime w[ould] be found" specifically in Jason Servis' cell phone conversations. The Bentsson Affidavit fails to meet that burden.

The probable cause alleged is based on an innocuous conversation intercepted on the Navarro phone in which Navarro tells the other person (alleged to be Servis) that medications should be kept under lock, and a discussion about the use of SGF-1000 and Clenbuterol, neither of which has ever been proven to be a performance enhancing substance in Bentsson's affidavit. To the contrary, as set forth above, lab tests known to the FBI show that SGF-1000 is not a PED or growth factor, and that Clenbuterol was found in Servis' horses in a trace amount. No facts in the affidavit support a finding that Clenbuterol is a PED. No facts support a finding that the targeted phone is being used in furtherance of criminal

29

activity.

In *United States v. Gotti*, 459 FR.3d 296, 344-45 (2d Cir. 2006), the Court affirmed a probable cause finding that a targeted phone was used in connection with the commission of a criminal offense based on an affidavit that detailed surveillance; toll records; and false subscriber information which indicated use of the phone in organized crime activity. Similarly, the Second Circuit affirmed a wiretap application setting forth probable cause to believe that the targeted phone was used in the furtherance of drug trafficking where the affidavit contained a detailed account of how the use of the phone and key Latin King gang members conducted their illegal activities over the target phones, setting forth specific instances where the phone was used in this regard. *United States v. Diaz*, 176 F.3d 52, 110 (2d Cir. 1999).

In an effort to sustain their burden in the Servis Affidavit, an analysis of the cell phone use was provided over a 10 month period. The affidavit sets forth that the phone was used to contact                an owner and breeder, nine times by calls and 39 times electronically. A conclusory statement is made that           is an owner that condones or encourages horse doping by trainers. However, there are no specific factual allegations that any one of those calls were in furtherance of illegal offenses.        Affidavit at 61.

In the analysis of the Rhein phone, the           Affidavit makes no factual statements to establish probable cause to

believe that the phone has been used in the furtherance of criminal offenses. There is an analysis of the number of toll calls and a statement that the Rhein phone connected with another targeted phone but no factual statement is offered to believe that any phone calls discussed criminal offenses. Bergen Affidavit at 101-102.

### CONCLUSION

Title III commands in plain and unqualified terms that "no part of the contents of [an intercepted] communication and no evidence derived therefrom may be received in evidence in any trial ...    before any court ...    if the disclosure of that information would be in violation of' Title III. 18 U.S.C. § 2515. The Supreme Court has held that Title III, 18 U.S.C. § 2518(10)(a), "require[s] suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device," *Giordano,* 416 U.S. at 527. The requirement of a full and complete - and forthright - statement of the material facts establishing probable cause directly and substantially implements Title III's "stringent conditions" on wiretap authority, *Gelbard,* 408 U.S. at 46, and is indispensable to ensuring the independent judicial review of *ex parte* wiretap applications that is essential to vindicate Congress's

"overriding" concern with privacy, *id.* at 48. Accordingly, as set forth herein, the government's violations of Title III in this case warrant statutory suppression under Title III, as well as constitutional suppression under the Fourth Amendment.

Dated:   New York, New York
         August 2, 2021

                              Respectfully submitted,

                              Robert M. Baum
                              Assistant Federal Defender
                              52 Duane Street, 10th Floor
                              New York, New York 10007
                              Tel.: (212) 417-8760
                                    646) 588-8322


TO:   **AUDREY STRAUSS, ESQ.**

      Acting United States Attorney
      Southern District of New York
      One St. Andrew's Plaza
      New York, New York 10007
      Attn:   **Andrew Adams, ESQ.**
              **Sarah Mortazavi, ESQ.**
              **Benet Kearney, ESQ.**
              Assistant United States Attorneys